UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-81503-CV-Rosenberg

JEFFREY LINDER, M.D.,

             Plaintiff,

v.

THE NORTHWESTERN MUTUAL
LIFE INSURANCE CO,

             Defendant.

_____/

## REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT
## [ECF NOS. 42, 44]

        This matter is before the Court on the parties' cross-motions for summary judgment. This

matter was referred to me by Judge Rosenberg for a Report and Recommendation. I have reviewed

the motions for summary judgment, the statements of material fact, the responses and replies, as

well as the supplemental briefs. I conducted an oral argument on December 22, 2020.  I am fully

advised and this matter is ripe for decision.

        Dr. Linder brings this one-count diversity action seeking a declaration that he is entitled to

certain future benefits under a disability insurance policy issued by Northwestern Mutual. ECF

No. 1.  He moves for summary judgment in the form of a declaratory judgment in his favor. [1]

_____

[1] The Complaint captions Count I as "Breach of Contract."  The Complaint does not seek present
damages.  Instead, it seeks only "judgment that Dr. Linder is totally disabled under the terms of
the Policy and eligible for monthly disability benefits for life so long as he continues to meet the
definition of total disability under the Policy."  ECF No. 1 ¶35.  Despite the caption on Count I, at
the oral argument, the parties affirmed that they have agreed to treat Count I as a request for
declaratory judgment.  ECF No. 72; *see* Defendant's Motion for Summary Judgment, ECF No. 42
at 2, n.1.

Northwestern Mutual moves for summary judgment based on statute of limitations, failure to provide timely notice and proof of loss, accord and satisfaction, waiver, and estoppel.

## UNDISPUTED MATERIAL FACTS[2]

### Dr. Linder's Background

1.      Dr. Jeffrey Linder is a medical doctor, trained in orthopedic surgery.  DSOF ¶1

2.      He turned 60 years old in April 7, 2019.  DSOF ¶15; ECF No. 43-2 at 39.

3.      He graduated from Cornell University with a double major in Business and Biology.  As part of his business classes, he studied contracts.  DSOF ¶2

4.      After graduating from Cornell, he attended New York Medical College, graduating with an M.D. degree in 1987.  He began specializing in orthopedic surgery in 1988. DSOF ¶3.

5.      Dr. Linder never became board certified in orthopedic surgery.  DSOF ¶5

6.      Dr. Linder began his private practice in orthopedic surgery with Gold Coast Orthopedics in 1992. PSOF ¶6.  Dr. Linder was made partner in 1994.  PSOF ¶7.

7.      Dr. Linder started his solo medical practice in 1995 as Jeffrey F. Linder, M.D., P.A.  DSOF ¶7, PSOF ¶8.  He continues to practice under this entity.

8.      At the time he left Gold Coast Orthopedics, Dr. Linder maintained surgical privileges at several area hospitals including Good Samaritan Medical Center, St. Mary's Hospital and Palm Beach Gardens Medical Center.  ECF No. 43-2 at 50-51.

---

[2] These facts are derived from the Statements of Material Facts submitted in support of both Motions for Summary Judgment.  For citation purposes, "PSOF ¶" refers to Dr. Linder's Statement of Material Facts in support of his Motion for Summary Judgment (ECF No. 43); "DSOF ¶" refers to Northwestern Mutual's Statement of Material Facts in support of its Motion for Summary Judgment (ECF No. 41).

***The Policy***

9.      On September 9, 1994, Northwestern Mutual issued Dr. Linder individual disability income Policy No. D1 075 723.  ECF No. 43-1 (hereinafter "Policy"); PSOF ¶1, DSOF ¶8.

10.      The Policy provides "benefits when the Insured is totally or partially disabled." Policy §1.1.

11.      The Policy defines "Total Disability" as:

**Total Disability.** Until the end of the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation. After the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation.

*Id.* §1.2; DSOF ¶12; PSOF ¶2.

12.      The Policy defines the "Initial Period" as the time from the day the disability starts through September 9, 2024, but not less than 24 months of benefits.  Policy §1.1.

13.      The Policy does not define the term "principal."

14.      As relevant here, the Policy defines "occupation" as "the occupation of the Insured at the time he became disabled."  *Id.*

15.      The Policy (as modified by the Proportionate and Transition Benefits rider that supersedes the definition of "partial disability" in §1.3) states:

**Partial Disability**:  The Insured is partially disabled when:

a.   he is unable to:

  •   perform one or more principal duties of his occupation; or

> - to spend as much time at his occupation as he did before the disability started; and
>
> b. he has at least a 20% Loss of Earned Income.

*Id.* at 13; DSOF ¶17.

16.     The "Full Benefit" is the "maximum amount of monthly income payable under the policy."  Policy §1.1.  The "Full Benefit" under the Policy, as initially issued, was $3,000 per month from 1994-95.  Between 1995 and 1998, the "Full Benefit" increased by $510, and now stands at $3,510 per month.  DSOF ¶10.

17.     A person on total disability receives the Full Benefit.   DSOF ¶11.

18.     The Partial Disability benefit under the Policy pays a "proportionate benefit," that is, the Full Benefit is reduced to reflect the Insured's percentage of lost income.[3]  But, if the Insured has at least an 80% loss of earned income, there is no reduction of the full benefit. DSOF ¶18.

19.     Section 1.6 of the Policy provides a lifetime benefit for total disability.  It states in full:

> **1.6 Lifetime Benefit for Total Disability**
>
> If page 3 provides that the Maximum Benefit Period has a lifetime benefit for total disability, then the Full Benefit is payable as long as total disability continues during the lifetime of the Insured, provided:
>
> - the Insured is totally disabled on the policy anniversary that follows his 60th birthday; and

---

[3] The precise calculation is:  $\text{Proportionate Benefit} = \text{Full Benefit} \ \text{x} \ \frac{\text{Earned Income}}{\text{Base Earned Income}}$

- the total disability continues beyond the policy anniversary that follows

  his 65th birthday."

Policy §1.6; DSOF ¶14.

20.    Page 3 of the Policy issued to Dr. Linder states that the Maximum Benefit Period is "to September 9, 2024, but not less than 24 months of benefits, with lifetime for total disability as provided in section 1.6."  Policy at 3.

21.    The annual Policy anniversary date for Dr. Linder is September 9.  DSOF ¶9.

22.    The Policy requires a written Notice of Claim to be submitted "within 60 days after the start of any loss covered by this policy.  If the notice cannot be given within 60 days, it must be given as soon as reasonably possible.  DSOF ¶20; Policy §4.1.

23.    The Policy also requires, "Written proof of disability must be given to the Company within 90 days after the end of each monthly period for which benefits are claimed. If the proof is not given within the 90 days, the claim will not be affected if the proof is given as soon as reasonably possible. In any event, the proof required must be given no later than one year after the end of each monthly period for which benefits are claimed unless the Owner was legally incapacitated."  DSOF ¶21. (Policy §4.3).

24.    The Policy permits Northwestern Mutual to require proof of the Insured's income for periods before and after the onset of the disability.  DSOF ¶19.

25.    The Policy further states, "No legal action may be brought for benefits under this policy within 60 days after written proof of disability has been given. No legal action may be brought after the applicable statute of limitations has run from the time written proof is required to be given."  DSOF ¶22 (Policy §4.7).

### *Dr. Linder's Disability Claim*

26.     Billing codes submitted to Northwestern Mutual in 2000 showed that between 1996 and June 2000, Dr. Linder performed 1,125 surgical procedures.  ECF No. 43-3 at 1.

27.     In or about 2000, Dr. Linder was diagnosed with carpal tunnel syndrome and was advised by his doctors to reduce his work hours to less than twenty per week.  DSOF ¶23.

28.     In June 2000, Dr. Reed Stone diagnosed Dr. Linder with carpal tunnel syndrome.  Dr. Stone concluded, "I believe it is contraindicated for him to continue doing surgeries which will exacerbate his clinical condition.  This particularly involves doing the hip replacement surgeries."  ECF No. 43-6 at 3.

29.     By June 2000, Dr. Linder's carpal tunnel syndrome prevented him from maintaining his hands fully functional throughout surgeries without additional breaks or interruptions.  ECF No. 43-2 at 39.

30.     In June 2000, Dr. Linder filed a claim for disability benefits with Northwestern Mutual based on his carpal tunnel syndrome. DSOF ¶24. By fax dated August 1, 2000, he notified his malpractice carrier that "due to carpal tunnel conditions I have changed my practice objective and scheduling to 20 (twenty) hours per week or less.  In addition, I have reduced my active staff privileges to only 1 (one) hospital to accomplish the same."  ECF No. 43-7 at 1.  He also notified the hospitals with whom he had privileges of his medical condition. PSOF ¶14.

31.     In his initial claim forms, Dr. Linder, in his own handwriting, listed five (5) "principal duties" he continued to perform and the approximate percentage of time he spent on each duty: operating (20%), in-hospital rounds (10%), pre/post-op (25%), nonsurgical (25%), and other (20%).   DSOF ¶25.

32.     During its investigation, Northwestern Mutual asked Dr. Linder to furnish a breakdown of his pre-disability occupational duties. Dr. Linder reported those duties as:

    a.     Operating Room - 15%

    b.     Pre-Post Operative Care - 38%

    c.     Hospital Rounds - 10%

    d.     Non-Surgical Office Practice - 12%. According to Dr. Linder, this would be for an example, treatment of a patient in the office where no surgery in the future was anticipated.

    e.     Office Orthopedic Surgical Practice - 25%. According to Dr. Linder, he is a physician who believes in conservative treatment of a patient and then performs surgery only as a last resort. For this grouping of 25%, these would be patients that were receiving conservative care; however, there was a possibility of surgery being performed in the future.

PSOF ¶15.

33.     Based on Dr. Linder's reported pre-disability job duties and Northwestern Mutual' s audit of his CPT billing codes, Northwestern Mutual determined that Dr. Linder's occupation at the time he became disabled was that of an orthopedic surgeon. PSOF ¶16.

34.     After confirming Linder's carpal tunnel problem, the job duties Linder described as the principal duties of his occupation, and the fact that Linder stated he was continuing to perform those principal duties, Northwestern Mutual determined that he was only partially disabled under the Policy.  DSOF ¶26.

35.     Dr. Linder was aware of this determination of partial disability at the time it was made in 2000 and disagreed with that determination at that time.  DSOF ¶28.

36.     In or about November 2000, Northwestern Mutual approved Dr. Linder's claim for disability benefits and began paying Dr. Linder monthly partial disability benefits.  DSOF ¶27; PSOF ¶17.

37.     In a November 2000 in-person meeting with Joe Shimko, a Northwestern Mutual field benefits consultant, Dr. Linder stated that he was 'not claiming total disability, rather, partial disability."  DSOF ¶29.

38.     In his Request for Continuation of Disability Benefits ("Continuing Claim Form") submitted on or about November 2, 2000, Dr. Linder answered "Yes" to Question 1, which asked, "Since the last request for benefits, have you performed any work of any kind AT YOUR PRIOR OCCUPATION or AT ANY OTHER OCCUPTION whether or not you received any income?"  In lieu or providing a date, Dr. Linder handwrote, "never completely stopped working." He indicated he was the 100% owner of the business where that work had been performed.  He said that he was working approximately 20 hours per week, and that the "Principal Duties Performed Since the Last Request for Benefits" were operating (20%), in-hospital rounds (10%), pre/post-op (25%), nonsurgical (25%), and other (20%). ECF No. 41-2 at 31; DSOF ¶25, DSOF ¶31.

39.     From 2000 to 2018, all of Dr. Linder's Continuing Claim Forms contained a hand-written response to Question 1 that he "never completely stopped working" or "never completely stopped."  His August 22, 2018, Continuing Claim Form stated he continued to work approximately 20 hours per week and listed four principal duties.  DSOF ¶34.

40.     In order to calculate the loss suffered by a partially disabled insured, Northwestern Mutual requires the insured, on a monthly basis, to submit a "Financial Statement for Calendar Month ____" (the "Financial Statement") as part of the Continuing

Claim Form. The Financial Statement is not required for an insured who is deemed to be totally disabled.   DSOF ¶32.

41.     In its administration of Dr. Linder's disability claim, Northwestern Mutual relied on the information contained in the Continuing Claim Forms.  DSOF ¶39.

42.     In reliance on the Continuing Claim Forms and the lack of other notice that Dr. Linder claimed to be totally disabled, Northwestern Mutual did not investigate Dr. Linder's claim for total disability until at least 2017.  DSOF ¶40.[4]

43.     Between 2000 and 2017, Northwestern Mutual did not:

a.   request that Dr. Linder undergo a "Medical Examination" by a physician of Northwestern Mutual's choosing, as proved in §4.6 of the Policy;

b.   conduct contemporaneous interviews of Dr. Linder's co-workers, to determine his activities, capabilities, limitations, etc.;

c.   interview Dr. Linder's treating physicians, including Dr. Stone;

d.   have a financial examiner of Northwestern Mutual's choosing conduct a financial examination, as provided by §4.8 of the Policy, to corroborate Dr. Linder's activities and sources of income;

e.   review Dr. Linder's calendars and patient and billing records to corroborate his activities;

f.   conduct surveillance to corroborate Dr. Linder's activities.

DSOF ¶41.

---

[4] DSOF ¶¶40 says Northwestern Mutual "did not investigate Dr. Linder's claim for total disability in 2000 or the ensuing years."  Dr. Linder's response states, "Disputed.  According to the attached, NWM began investigating Linder's total disability claim as early as 2017, long before its receipt of Linder's counsel's September 10, 2018 initial letter."  Whether Northwestern Mutual's investigation began in 2017 or 2018 is not material to the issues presented by the cross-motions.

44.     From the inception of Dr. Linder's claim for disability benefits in June 2000 to the current time (with the exception of the first month after the "Beginning Date" of his disability, when he was paid 50% of the Full Benefit), Dr. Linder has qualified for, and Northwestern Mutual has paid monthly, 100% of the "Full Benefit" under the partial disability provision of the Policy because Dr. Linder suffered more than an 80% loss of earnings.  DSOF ¶30, PSOF ¶35.  In total, Northwestern Mutual has paid Dr. Linder over $1.5 million in partial disability benefits under the Policy. DSOF ¶43.

45.     In April 2002, Dr. Linder's privileges to practice at Columbia Hospital were revoked "[d]ue to limitations of practice, unable to fully manage injury/treatment necessary for emergency patients, therefore, unable to fulfill E.R. call and will be unable to provide for the continuous care of patients. No longer considered Board Eligible due to inability to perform all orthopedic surgery procedures without restriction or limitation, therefore, unable to fulfill requirement for Board Certification within five (5) years of appointment." PSOF ¶20.

46.     In July 2003, Dr. Linder's medical malpractice carrier advised him that "due to a material change in the risk, your professional liability coverage will be automatically restricted to a non-surgical classification upon renewal of your upcoming policy period effective 7/7/03." PSOF ¶22.

47.     By the end of 2005, Dr. Linder had let go all of his practice's employees because he could no longer afford them. ECF No. 43-2 at 59.

48.     Dr. Linder continued to treat a limited number of patients through private practice.  PSOF ¶24.

49.     In a June 17, 2009 letter, Northwestern Mutual reduced the frequency of financial forms Linder was required to submit because Linder was showing a consistent income loss and receiving 100% of the Full Benefit with regularity:

> We have been considering you to be partially disabled, and we continue to do so.  Based on the information that you have been submitting, you have been qualifying regularly for 100% of the Proportionate Benefit, and it is not anticipated that that will change unless something changes in your current situation.  To streamline your claim, we are willing to forego monthly income and expense information from you.  In lieu of your monthly financial information, at the end of each calendar year we are willing to reconcile your taxable earned income as reported on your income tax returns.  Any discrepancies identified by the reconciliation may result in an adjustment of benefits paid for the year reviewed.

DSOF ¶33.

50.     In September 2009, Palm Beach Gardens Medical Center notified Dr. Linder that "despite your good standing on our Medical Staff, you no longer meet the qualification of Consulting Staff or any other current Bylaws category."  ECF No. 43-13 at 1.

### *The 2018 Reclassification Request*

51.     On or about September 10, 2018, Dr. Linder's counsel wrote to Northwestern Mutual.  The letter stated:

> I am seeking some clarification as to the current administration of Dr. Linder's claim. Northwestern Mutual has, thus far, categorized Dr. Linder's disability as partial disability, rather than a total disability. Dr. Linder believes that he qualifies for total disability according to the terms of his LTD policy number D10 078 723.

ECF No. 43-14.

52.     Included with this letter was a Continuing Claim Form dated September 24, 2018, which contained hand-written statements that Dr. Linder was performing surgical and non-surgical procedures on human beings and, in response to Question 1, stated that he had "never stopped working."  DSOF ¶35, ECF No. 41-4 at 118.

53.     There has been no change in Dr. Linder's carpal tunnel condition since the initial claim determination in 2000.  DSOF ¶42

54.     Dr. Linder believes he has been totally disabled "as of day one" of his disability claim.  DSOF ¶42.

55.     In February 2019, Northwestern Mutual noted that Dr. Linder was currently reporting that he was not working, although he had previously reported that he was working. ECF No. 43-15 at 1.

56.     Dr. Linder furnished Northwestern Mutual with the records of his April 2, 2019 office visit of with another of his treating neurologists, Sonia Cavanes-Nunez, M.D., which stated:

> **"History of Present Illness:** 59-year-old male orthopedic surgeon comes in today for evaluation of his CTS. It started in 2000 when he would notice that with increasing frequency his hands would cramp during surgery and he would have to take breaks. This led to him being unable to perform surgery, lost his hospital privileges and malpractice insurance. Unable to perform surgery, his practice dwindled. He is aware even if he underwent CTS surgery, he would have no guarantee of being able to use his hands as before or be able to resume practicing surgery. Presently his symptoms are intermittent numbness and tingling of both hands with spasms, weakness. Wakes up every night with both hands with burning like sensation."

PSOF ¶29.

57.     Dr. Nunez opined that, "Patient is completely disabled and permanently unable to perform as an orthopedic surgeon." ECF No. 43-16 at. 5

58.     Dr. Linder also furnished Northwestern Mutual with information regarding his occupational duties and earned income for September 2019. Dr. Linder reported that he worked less than one (1) hour per week; saw two (2) patients the entire month; and earned no income from patient care. ECF No. 43-18.

59.     In 2019, Linder's gross revenues were $1,712.00 and he had a $14,052.00 loss of earned income. ECF No. 43-19.

60.     Northwestern Mutual continues to maintain that Dr. Linder is Partially Disabled and that he would need to lack the ability to perform all principal job duties – which it asserts to be "all orthopedic surgery, pre/post op [pre-operation and post-operation] and hospital rounds" and a "non-surgical office practice" that "includes seeing patients for evaluation and performing all non-surgical procedures/treatment" to be considered Totally Disabled. ECF No. 43-20.

61.     Assuming he is alive, Dr. Linder will turn 65 years old in April 2024, so the following policy anniversary would be September 9, 2024.  DSOF ¶16.

## LEGAL PRINCIPLES

### 1. Summary Judgment

The legal standard for summary judgment is well-settled:

> Summary judgment is authorized only when, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). The party moving for summary judgment has the burden of meeting this exacting standard. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970). In applying this standard, the *Adickes* Court explained that when assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. *See Adickes*, 398 U.S. at 157.
>
> The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

*Those Certain Underwriters at Lloyd's Subscribing to Policy No. 25693 JB v. Capri of Palm Beach, Inc.*, 932 F. Supp. 1444, 1446 (S.D. Fla. 1996), aff'd sub nom. *Certain Underwriters v. Capri*, 128 F.3d 732 (11th Cir. 1997).

The moving party's burden on a motion for summary judgment "depend[s] on whether the legal issues ... are ones on which the movant or the non-movant would bear the burden of proof at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "[F]or issues on which the movant would bear the burden of proof at trial, 'that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial.'" *Id.* (quoting *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. In State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). "For issues, however, on which the non-movant would bear the burden of proof at trial, 'the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility.'" *Id.* (quoting *Four Parcels*, 941 F.2d at 1437–38).

*Nunez v. Coloplast Corp.*, No. 19-CV-24000, 2020 WL 2561364, at *1 (S.D. Fla. May 20, 2020) (J. Singhal). An issue is genuine if "a reasonable trier of fact could return judgment for the nonmoving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

Federal Rule of Civil Procedure 56 and Local Rule 56.1 set forth the procedures for pleading (and responding to) a Motion for Summary Judgment. Rule 56(c) states:

(1) Supporting Factual Positions. A party asserting that a fact . . . is genuinely disputed must support the assertion by:

      (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . admissions, interrogatory answers, or other materials . . .

    (2)  Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

Fed. R. Civ. P. 56(c). The Court has discretion to disregard a factual assertion or dispute that is not properly supported by admissible evidence. Fed. R. Civ. P. 56(e); S.D. Fla. L.R. 56.1(c), (d).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

    (1) give an opportunity to properly support or address the fact;

    (2) consider the fact undisputed for the purposes of the motion;

    (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

    (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

    (1) defer considering the motion or deny it;

    (2) allow time to obtain affidavits or declarations or to take discovery; or

    (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). A factual assertion that is not properly disputed may be deemed admitted "provided that: (i) the Court finds that the material fact is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply." S.D. Fla. L.R. 56.1(c).

## 2. *Declaratory Judgment*

The Declaratory Judgment Act provides that a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U. S. C. §2201. Article III of the constitution limits a federal court's jurisdiction to actual cases or controversies. *Lexmark Intern., Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 125 (2014). To satisfy this requirement, a party seeking declaratory relief must show that there is a "substantial likelihood that he will suffer injury in the future." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999). Without establishing a substantial likelihood of future injury, a party lacks Article III standing to seek declaratory relief. *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210–11 (11th Cir. 2019).

The Declaratory Judgment Act contains a similar limitation; it requires an "actual controversy." 28 U.S.C. §2201; s*ee Emory v. Peeler,* 756 F.2d 1547, 1551–52 (11th Cir. 1985). This requirement is congruent with the Article III case or controversy requirement. *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239-40 (1937). The actual controversy requirement "is jurisdictional and, thus, 'a threshold question in an action for declaratory relief must be whether a justiciable controversy exists.'" *Odyssey Marine Exploration, Inc. v. Unidentified, Shipwrecked Vessel or Vessels*, 512 F. App'x 890, 895 (11th Cir. 2013) (quoting *U. S. Fire Ins. Co. v. Caulkins Indiantown Citrus Co.*, 931 F. 2d 744, 747 (11th Cir. 1991)). A party seeking declaratory relief bears the burden of establishing jurisdiction by a preponderance of the evidence. *McCormick v. Aderholt,* 293 F.3d 1254, 1257 (11th Cir. 2002).

"[A] declaratory judgment serves to clarify the legal relations and is not for the purpose of making factual determinations." *Medmarc Casualty Ins. Co. v. Pineiro & Byrd PLLC*, 783 F. Supp. 2d 1214, 1216 (S.D. Fla. 2011). "Based on the facts alleged, there must be a substantial

16

continuing controversy between two adverse parties.  'The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred.  Additionally, the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury.'"  *Malowney*, 193 F.3d at 1346–47 (11th Cir. 1999) (quoting *Emory*, 756 F.2d at 1552) (citations omitted).

Even if an actual controversy exists, the Court has "unique and substantial discretion in deciding whether to declare the rights of litigants."  *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286 (1995), *cited in MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 136 (2007).  That discretion is "exceptionally broad."  *Otwell v. Alabama Power Co.,* 747 F.3d 1275, 1280 (11th Cir. 2014).  The Declaratory Judgment Act "confers a discretion on the courts rather than an absolute right upon the litigant.  When all is said and done, . . . 'the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power."  *Wilton,* 515 U.S. at 287 (citations omitted).  "Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking declaratory judgment before trial or after all arguments have drawn to a close."  *Id.* at 288.

### 3.  *Florida Insurance Law*

Florida law defines "insurance" as a contract whereby one undertakes to indemnify another or pay or allow a specified amount or a determinable benefit upon determinable contingencies."  *See* §624.02, Fla. Stat. Ann.  An insurance contract is an arrangement whereby the insurer, in return for payment of a premium, assumes particular risks and promises to pay the insured "a certain or ascertainable sum of money on a specified contingency, such as the destruction, death, loss, or injury of someone or something by specified peril."  30 Fla. Jur. 2d Insurance §1.

"In Florida, '[w]here the duty of an insurer rests upon the legal effect of the provisions of an insurance policy, the interpretation of the policy is a matter of law for the Court to determine, and is therefore amenable to summary judgment.'" *Sparta Ins. Co. v. Colareta*, 990 F. Supp. 2d 1357, 1363 (S.D. Fla. 2014) (J. Rosenbaum) (quoting *Great Am. Fid. Ins. Co. v. JWR Constr. Servs., Inc.,* 882 F. Supp. 2d 1340, 1350 (S.D. Fla. 2012) (J. Huck)). "Insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties." *Prudential Property and Cas. Ins. Co. v. Swindal*, 622 So. 2d 467, 470 (Fla. 1993). The terms of an insurance policy "should be taken and understood in their ordinary sense, and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties - - not a strained, forced or unrealistic construction." *Siegle v. Progressive Consumers Ins.,* 819 So. 2d 732, 736 (Fla. 2002) (citation omitted).

A policy provision is ambiguous if there are two competing, reasonable interpretations of that provision. *See Cont'l Ins. Co. v. Roberts,* 410 F.3d 1331, 1334 (11th Cir. 2005). "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." *Auto–Owners Ins. Co. v. Anderson,* 756 So. 2d 29, 34 (Fla. 2000). If there is no ambiguity, the contract must be construed according to its plain language and given effect as written. *See Sparta Ins. Co.*, 990 F. Supp. 2d at 1363.

> In construing an insurance policy, courts should read the policy as a whole, endeavoring to give every provision its full meaning and operative effect. Indeed, a single policy provision should not be considered in isolation, but rather, the contract shall be construed according to the entirety of its terms as set forth in the policy and as amplified by the policy application, endorsements, or riders.

*Gen. Star Indem. Co. v. West Florida Village Inn, Inc.,* 874 So. 2d 26, 30 (Fla. Dist. Ct. App. 2004) (internal citations omitted). *See also Steadfast Ins. Co. v. Celebration Source, Inc.*, 240 F. Supp.

3d 1295, 1300 (S.D. Fla. 2017) (J. Scola) ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any application therefor or any rider or endorsement thereto.") (quoting Fla. Stat. §627.419 (2010)).  "The application thus becomes a part of the agreement between the parties and the policy together with the application form the contract of insurance." *Zenith Ins. Co. v. Commercial Forming Corp.,* 850 So. 2d 568, 570 (Fla. Dist. Ct. App. 2003) (quoting *Mathews v. Ranger Ins. Co.*, 281 So.2d 345, 348 (Fla. 1973)).

A claim for breach of an insurance contract accrues when the insurer denies or underpays a claim.  *Coal. for Indep. Living Options, Inc. v. Philadelphia Indem. Ins. Co.,* 10-CV-81479, 2011 WL 13227820, at *2 (S.D. Fla. Jan. 12, 2011) (J. Ryskamp) citing *State Farm Mut. Auto Ins. Co. v. Lee*, 678 So. 2d 818, 821 (Fla. 1996); *J.J. Gumberg Co. v. Janis Serv., Inc.*, 847 So. 2d 1048, 1050 (Fla. 4th DCA 2003) ("In regard to insurance contracts, a specific refusal to pay a claim is the breach which triggers the cause of action and begins the statute of limitations running.") quoting *Donovan v. State Farm Fire and Cas. Co.,* 574 So. 2d 285, 286 (Fla. 2d DCA 1991).

## DISCUSSION

### 1.  *Northwestern Mutual's Motion for Summary Judgment [ECF No. 42]*

Northwestern Mutual moves for summary judgment based on (1) statute of limitations, (2) lack of timely notice, (3) accord and satisfaction, (4) waiver, and (5) estoppel.  I first frame the issue for decision.

As the operative pleading makes clear, Dr. Linder is not seeking any past benefits.  Even though he believes he has been totally disabled since 2000, he is not seeking to have his disability

reclassified retroactively.[5]  Instead, he takes the position that, regardless of his past classification, the lifetime benefits provision of the Policy requires Northwestern Mutual to re-evaluate whether he was totally disabled on September 9, 2019, which was the policy anniversary immediately following his 60th birthday.[6]  He seeks a declaratory judgment that he was totally disabled on that date and that he is "eligible for monthly disability benefits for life so long as he continues to meet the definition of total disability under the Policy."  ECF No. 1 ¶ 35.  Dr. Linder's Response to Northwestern Mutual's Motion for Summary Judgment makes his position clear.  It states, "Contrary to Defendant's assertions, Plaintiff does not desire to be reclassified as totally disabled from day one.  Nor does Plaintiff allege that it was NWM's initial claim decision, classifying him as partially disabled in 2000, that breached the contract.  Rather, Plaintiff's specific allegation is that NWM's breach occurred in 2019 when NWM refused to recognize Plaintiff's disability as total and his entitlement to monthly disability benefits for life.  Thus, the central issue for resolution is not Linder's degree of disability in 2000 but in 2019."  ECF No. 60 at 1.

So, the issue for decision is whether the Policy requires Northwestern Mutual to entertain Dr. Linder's 2018 reclassification request.  This question presents an appropriate issue for declaratory relief.  For the following reasons, I find that Dr. Linder's current request to be reclassified as totally disabled is the same claim that was submitted in 2000, when he was found to be partially disabled.  That claim is barred by the statute of limitations and the notice provision of the Policy.

---

[5] In the Complaint, Dr. Linder asserts that he notified Northwestern Mutual in September 2018 that "he believed his disability has been misclassified."  ECF No. 1 ¶26.  Since then, he has "repeatedly requested Defendant reclassify his disability or explain why it is refusing to do so." *Id.* ¶ 27.  He therefore requests a declaratory judgment that he "is totally disabled under the terms of the Policy and eligible for monthly disability benefits for life so long as he continues to meet the definition of total disability under the Policy." *Id.* ¶ 35.

[6] This lawsuit was filed November 6, 2019, after the policy anniversary date.  ECF No. 1.

Viewed in its totality, the unambiguous terms of the Policy do not require Northwestern Mutual to consider Dr. Linder's reclassification request.  No benefits are owed under the Policy until the insured has either a "total disability" or a "partial disability."  Policy §1.1 ("This policy provides benefits when the Insured is totally or partially disabled.").  The onset of the disability is the "loss" against which the Policy insures. The insured must file a written Notice of Claim notifying Northwestern Mutual "within 60 days after the start of the loss" or as soon thereafter as is reasonably possible.   Policy §4.1.  Northwestern Mutual then has an obligation to evaluate the claim in good faith and pay any benefits that are owed under the policy.  *Vest v. Travelers Ins. Co.,* 753 So. 2d 1270, 1275 (Fla. 2000) (Insurer must "timely evaluate and pay benefits owed on the insurance policy.").  Any lawsuit challenging Northwestern Mutual's coverage determination must be filed within 5 years of the allegedly wrongful denial of coverage.  Fla. Stat. §95.11(2)(b).

Depending on the insured's condition, different benefits are payable under the Policy.  The Policy contemplates that these benefits may change over time.   For example, under the Proportionate and Transition Benefits rider (ECF No. 43-1 at 13), the monthly benefit payment to a partially disabled person can change depending on how the person's earned income changes. Similarly, the Policy offers an Indexed Income Benefit (*Id.* at 12) and a Future Increase Benefit (§1.4) under which the benefit is increased by a cost of living adjustment.  Some benefits have a termination date.  For example, under the Indexed Income Benefit, an insured receiving the Lifetime Benefit does not receive cost-of-living increases after the first policy anniversary following the Insured's 65th birthday.  *Id.*  In all these cases, no new loss or new claim is required; the benefits are automatically adjusted.

The Lifetime Benefit for Total Disability is no different.  The Policy makes no mention of a separate application or required re-evaluation for this benefit.  To the contrary, the summary

21

cover page of the Policy indicates that the Lifetime Benefit for Total Disability is part of a single, integrated but variable benefit; it defines the Maximum Benefit Period to end on "September 9, 2024, but not less than 24 months of benefits, with lifetime for total disability as provided in Section 1.6."  Policy at 3.  There is no reason to treat the Lifetime Benefit for Total Disability differently from all the other contingent and variable benefits under the Policy – entitlement to that benefit derives from the underlying loss and the associated claim, with no separate re-evaluation required at a later date.

Although the Policy does not explicitly contain a reclassification procedure, at oral argument, Northwestern Mutual explained that if a partially disabled person's condition worsens to the point that he becomes totally disabled, he can file a new claim based upon this new "loss" and seek to have his status under the Policy reclassified.  *See* ECF No. 72; *see also* Policy §1.11 (Benefits for Separate Disabilities) (permitting multiple claims arising from related disabilities).

The next question is whether Dr. Linder's 2018 request for reclassification is a timely and cognizable new "claim" under the Policy or is subsumed within the claim he made in 2000. Decisions by both Florida courts and this Court hold that there is no new "claim" unless there is a new "loss."  For the following reasons, I find that Dr. Linder's reclassification request is an untimely attempt to revisit the prior finding of partial disability.

In *Community Bank of Florida v. Progressive Casualty Ins. Co.,* 2013 WL 12093842 (S.D. Fla. Feb. 25, 2013) (J. Ungaro), the plaintiff bank made a claim in September 2005 for payment under an indemnity bond after it was the victim of a fraud scheme.  The insurer denied the claim in January 2006.  After obtaining additional information about the fraud, the bank resubmitted its insurance claim in May 2007.  In December 2007, the insurer again denied the claim, but on different grounds.  In October 2011, the bank again resubmitted its claim arguing that new

evidence showed that the 2007 denial should be reconsidered.  The insurer denied the claim based on the statute of limitations.  The bank sued for breach of contract.

Relying on two Florida appellate decisions, *Roth v. State Farm Mut. Auto Ins. Co.*, 581 So. 2d 981, and *Passman v. State Farm Fire and Cas. Co*, 779 So. 2d 323 (Fla. 2d DCA 1999), Judge Ungaro held that the limitations period began to run in January 2006 when the insurer denied the bank's first claim.  She reasoned, "The subsequent claims submitted by Community Bank sought to recover for the losses that the bank sustained as a result of the Customers' fraudulent scheme, the same losses on which the original claim sought to collect. As such, each of Community Bank's claims was subject to the limitations period that began when Progressive denied the first claim." 2013 W.L. 12093842 at 5.

*Roth* arose from a claim under an automobile insurance policy.  The plaintiffs were involved in an auto accident in 1982.  They received PIP benefits for a period of time.    In December 1984, they asked the insurance carrier to pay for a jacuzzi.  The insurer denied the claim in March 5, 1985.  The plaintiff renewed his request for a jacuzzi in August 1988.  The insurer denied the claim in December 1988 on multiple grounds, including that the statute of limitations had run.  The insurer also denied a claim for other medical expenses.  The insured sued for breach of contract based on both denials.  The trial court dismissed the claims based on the statute of limitations.

On appeal, the Second DCA reversed because the trial court had misapplied the law on when to start the limitations period for a PIP claim.  It said, "We, however, would note that an insured cannot extend the limitations period by repeatedly resubmitting the same claim as the Roths did for the jacuzzi.  The statute of limitations for the jacuzzi claim began to run on March

5, 1985, when State Farm first provided written notice of the denial of the claim."  *Roth,* 581 So. 2d at 983.

    *Passman* involved a homeowner's insurance claim.  In 1990, the homeowners submitted an insurance claim based on a crack in the master bedroom wall.  The insurer denied coverage in January 1991 based on its conclusion that the loss fell within a policy exclusion for "settling, cracking, shrinking, bulging or expansion of pavement, patios, foundations, walls, floors, roofs or ceilings."  In 1995, the homeowners noticed a large crack in the tile floor of the master bedroom. They notified the insurer, who again denied coverage.  Thereafter, the house suffered substantial structural damage which caused it to become a total loss. The homeowners sought coverage under the "collapse coverage" provision of their insurance.  In June 1996, the insurer denied coverage. The homeowner sued.

    The trial court dismissed the case based on the statute of limitations.  It found that the limitations period began in January 1991 and expired in January 1996.  The appellate court framed the issue as "State Farm's statute of limitations defense turns on a determination whether the claim Ms. Passman sued on in November 1996 was the same claim that State Farm denied in January 1991.  *Id.* at 325 (citing *Roth*).  It "concluded[d] that the two claims were different.  To be sure, as the circuit court pointed out, in each instance the underlying cause of the loss was the same.  But the January 1991 claim involved only settlement cracks, a loss which clearly was not covered by the policy.  The second claim, filed in April 1995 and finally denied in June 1996, involved the collapse of Ms. Passman's home, a loss which arguably was covered under the policy and which had not occurred at the time of the first claim."  *Id.*

    These cases stand for the principle that two insurance claims are distinct only if they involve a different loss.  *See also Palma Vista Condo. Ass'n of Hillsborough County, Inc. v.*

*Nationwide Mut. Fire Ins. Co., Inc.,* 8:09-CV-155-T-27EAJ, 2010 WL 4274747, at *6 (M.D. Fla. Oct. 7, 2010) (2008 claim for structural termite damage was a different claim from 2003 claim by same property owner for fallen wall tiles).   Here, the sole loss is the onset of carpal tunnel syndrome prior to 2000.   Northwestern Mutual was notified of this loss and denied total disability in 2000.   Dr. Linder had five years thereafter to bring suit to challenge that denial.   He did not. Any current suit to be reclassified as totally disabled based on the same carpal tunnel syndrome would be barred by the statute of limitations.

Northwestern Mutual argues in the alternative that the request for reclassification is untimely under the Notice of Claim provision of the Policy. *See* Policy §4.1. The purpose of a notice provision in an insurance policy is to allow an insurer "to evaluate its rights and liabilities, to afford it an opportunity to make a timely investigation, and to prevent fraud and imposition upon it." *LoBello v. State Farm Florida Ins. Co.,* 152 So. 3d 595, 598 (Fla. 2d DCA 2014) (citation omitted). Untimely notice is a "a legal basis for the denial of recovery under the policy" unless the insured can overcome a presumption that the insurer was prejudiced. *Ideal Mut. Ins. Co. v. Waldrep,* 400 So. 2d 782, 785 (Fla. 3d DCA 1981), *cited in Laquer v. Citizens Prop. Ins. Corp.*, 167 So. 3d 470, 473 (Fla. 3d DCA 2015); *Bankers Ins. Co. v. Macias,* 475 So. 2d 1216, 1218 (Fla.1985); *1500 Coral Towers,* 112 So. 3d at 544–45; *LoBello,* 152 So. 3d at 599.  Here, the Policy requires notice within 60 days or "as soon as reasonably possible."  Florida courts have interpreted similar phrases to mean that insured must act "with reasonable dispatch and within a reasonable time in view of all of the facts and circumstances of the particular case." *Yacht Club on the Intracoastal Condo. Ass'n, Inc. v. Lexington Ins. Co.,* 599 Fed. Appx. 875, 879 (11th Cir.2015) (citation omitted). "Thus, the issue of whether an insured provided "prompt" notice generally presents an issue of fact. *LoBello,* 152 So.3d at 600, *cited in Laquer,* 167 So. 3d at 474.

25

Dr. Linder's request for reclassification in 2018 was untimely. Under the Policy, Dr. Linder is "totally disabled" only if "he is unable to perform the principal duties of his occupation." Policy §1.2. This determination turns on two factors: (1) the scope of the principal duties of his occupation, and (2) whether his medical condition prevents him from performing those duties. It is undisputed that at all relevant times the relevant occupation has been orthopedic surgeon. It is also undisputed that "[t]here has been no change in [Dr.] Linder's carpal tunnel condition since Northwestern Mutual's initial claim determination in 2000." DSOF ¶42. Finally, the record shows that the last non-medical event that affected Dr. Linder's ability to act as an orthopedic surgeon was in September 2009 when he lost his staff privileges at Palm Beach Gardens Medical Center. ECF No. 43-13 at 1. Therefore, even assuming without deciding that Dr. Linder's condition changed from partially disabled to totally disabled, this change occurred no later than 2009. Dr. Linder did not provide written notice of this situation until almost a decade later, in 2018. Even viewing the undisputed evidence in the light most favorable to Dr. Linder, this notice was untimely and Dr. Linder has not rebutted the presumption of prejudice. For this independent reason, Northwestern Mutual is not required to reconsider whether Dr. Linder is totally disabled.

Northwestern Mutual moves for summary judgment on the affirmative defense of accord and satisfaction. "An accord and satisfaction results when: (1) the parties mutually intend to effect a settlement of an existing dispute by entering into a superseding agreement; and (2) there is actual performance in accordance with the new agreement. Compliance with the new agreement discharges the prior obligations." *Martinez v. S. Bayshore Tower, L.L.L.P.*, 979 So. 2d 1023, 1024 (Fla. 3d DCA 2008), citing *Rudick v. Rudick*, 403 So.2d 1091, 1094 (Fla. 3d DCA 1981). Viewing the evidence in the light most favorable to Dr. Linder, Northwestern Mutual has not met its burden of showing that Dr. Linder accepted partial disability payments with the intent to affect a settlement

of an existing dispute.  Northwestern Mutual's Motion for Summary Judgment on this basis should be denied.

Similarly, Northwestern Mutual's request for summary judgment based on waiver and estoppel should be denied.  These defenses appear to be based on Northwestern Mutual's mistaken belief that Dr. Linder was seeking retroactive total disability benefits.  Given that Dr. Linder is only claiming prospective benefits, and viewing the evidence in the light most favorable to Dr. Linder, Northwestern Mutual has not met its burden of showing estoppel or waiver.

## 2. *Dr. Linder's Motion for Summary Judgment [ECF No. 44]*

As discussed above, Dr. Linder's request for reclassification is barred by the statute of limitations and/or is untimely under the Policy, so I need not reach the merits of his summary judgment motion.  Nevertheless, for completeness of the record, I will discuss that motion briefly.  Dr. Linder asks the Court to enter "a judgment as a matter of law finding him Totally Disabled as of September 9, 2019 and thus entitled to Lifetime Benefits." ECF No. 44 at 16-17.  Northwestern Mutual argues there is a disputed issue of fact as to whether Dr. Linder is "unable to perform the principal duties of his occupation" such that he meets the Policy's definition of "totally disabled." ECF No. 58.

Dr. Linder's motion should be denied for multiple reasons.  First, determining whether he is totally disabled is the sort of fact-based inquiry that is not appropriate for declaratory judgment.  Second, under any circumstances, the additional benefits Dr. Linder seeks are not payable until on or after the policy anniversary following his 65th birthday, that is, September 9, 2024.  Any such payment is contingent on Dr. Linder continuing to be alive and totally disabled after that date.  It would be speculative for me to try to predict Dr. Linder's future medical condition.  As such, no declaratory judgment could be entered on this issue.  Third, the extent of Dr. Linder's ability to

work on September 9, 2019, is a disputed issue of fact that precludes summary judgment.  Dr. Linder points to the medical testimony and his own testimony. *See, e.g.,* PSOF ¶¶ 21, 24, 26, 31. Northwestern Mutual disputes this evidence; it points to (among other evidence) Dr. Stone's reports and Dr. Linder's monthly Continuing Claim Forms which indicate he has never stopped working as an orthopedic surgeon.  *See, e.g.,* ECF Nos. 41-2 at 57-58; 41-4 at 118; DSOF ¶¶34, 35.  This dispute must be resolved by a finder of fact at trial.  Fourth, even if these facts are treated as undisputed, viewed in the light most favorable to Northwestern Mutual, they do not establish by a preponderance of the evidence that Dr. Linder is totally disabled, so he is not entitled to judgment as a matter of law.

I also decline to address Northwestern Mutual's objection to the affidavit of Dr. Reed Stone. *See* ECF No. 58 at 5-9.  During discovery, Dr. Stone was disclosed as a non-expert witness who had "General knowledge of Plaintiff's disability, medical treatment, claim for disability insurance benefits, and/or related matters."  ECF No. 57-3.  He was never disclosed as an expert, nor was any summary of expert opinions disclosed pursuant to Rule 26(a)(2)(C).  ECF No. 57 ¶¶ 36-40.  Northwestern Mutual objects to me considering Dr. Stone's affidavit insofar as it opines that Dr. Linder was (and is) permanently disabled.   Dr. Linder responds that Judge Rosenberg's Trial Order excused him from these disclosures. ECF No. 63 at 7-8.  I need not resolve this dispute. Even considering Dr. Stone's affidavit, my recommendation does not change.

## **RECOMMENDATION**

WHEREFORE, it is **RECOMMENDED** that Northwestern Mutual's Motion for Summary Judgment be **GRANTED**, that Dr. Linder's Motion for Summary Judgment be **DENIED**, and that final judgment be entered for Northwestern Mutual.

## **NOTICE OF RIGHT TO OBJECT**

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Robin L. Rosenberg, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If counsel do not intend to file an objection to this Report and Recommendation, they shall file a notice to that effect within five (5) days.**

**DONE AND SUBMITTED** in Chambers this 5th day of January, 2021 at West Palm Beach in the Southern District of Florida

BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE